**Link: 86**

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

KEVIN DWAINE MITCHELL, NATASHA )
LYTLE, et al., )
                              )   **Case No. CV 11-1796 GAF (OPx)**
              Plaintiffs,     )
                              )   **MEMORANDUM AND ORDER**
       v.                     )   **REGARDING PLAINTIFFS'**
                              )   **MOTION FOR CONDITIONAL CERTIFICATION**
                              )   **OF AN FLSA COLLECTIVE ACTION**
                              )
                              )
ACOSTA SALES, LLC, et al.     )
                              )
              Defendants.     )
                              )
                              )
_____ )

## I.

## INTRODUCTION

The Plaintiffs in this action are former non-exempt employees of Defendants Acosta Sales, LLC, and Acosta, Inc. (together, "Acosta," or "Defendants"), who provided various merchandising services to food and consumer goods retail stores that are Acosta's customers and clients.  Plaintiffs' Complaint alleges that they and other Acosta "merchandisers" have been systematically denied regular and overtime compensation, pursuant to Acosta's policies and practices, in violation of, inter alia,

the Fair Labor Standards Act, 29 U.S.C. § 201 et seq.. (Docket No. 1, Compl. ¶¶ 17, 32–38.) Plaintiffs now seek conditional certification of a collective class, pursuant to 29 U.S.C. § 216(b). (Docket No. 86.)

For the reasons that follow, the Court concludes that Plaintiffs have met their burden to demonstrate that they are similarly situated to other members of the proposed class. Accordingly, the Court **GRANTS** Plaintiffs' Motion for conditional certification to proceed as a collective action under the FLSA.

## II.

## FACTUAL BACKGROUND AND THE PARTIES' EVIDENCE

**A. INTRODUCTION AND BACKGROUND**

Acosta operates a brokerage and marketing business for food and consumer goods outlets in all 50 states in the United States, and in Canada. (Docket No. 138, Declaration of Toni Gerwitz in Support of Defendants' Opposition [Gerwitz Decl.] ¶¶ 2–3.) Through its "retail department," Acosta provides various merchandising services to retail stores (Acosta's "customers" or "Stores"), and to manufacturers of consumer products (Acosta's "clients" or "Manufacturers"). (Id. ¶¶ 2, 4.) These services are performed at a variety of retail locations, and include checking inventory and stocking products on the shelves; ensuring that products are properly displayed, priced, rotated, and sold; setting up, photographing, and tearing down promotional product displays; and collecting data and communicating with store management about product issues. Acosta employs approximately 14,300 merchandisers to carry out these functions, in nine organizational management divisions, and under 10 active, and five inactive, job titles. (Id. ¶ 4, 8; Docket No. 92, Declaration of Joshua G. Konecky in Support of Plaintiffs' Motion [Konecky Decl.], Ex. D [9/23/11 Acosta Interrogatory Response] at 10; Konecky Decl., Ex. B, [Deposition of Toni Gerwitz, Person Most Knowledgeable ("PMK Depo.")] 33:2–18.) Approximately 12,000 of these merchandisers work in the United States. (PMK Depo. 29:10–20.)

**B. THE DUTIES OF ACOSTA MERCHANDISERS**

### 1. Generally

Acosta's merchandisers perform tasks within one of two broad categories: physical merchandising tasks at the request of Stores, such as arranging and rearranging food products consistent with store layout plans, referred to as "schematics" or "plan-o-grams"; and answering questions, at the request of Manufacturers, on handheld or laptop devices ("NARS Devices") while physically in a store, regarding placement and pricing of the Manufacturer's products. (Gerwitz Decl. ¶ 5; see also id. ¶¶ 22–39 (describing functions performed by merchandisers in Acosta's Continuity and Target-Dedicated divisions using NARS Devices); Konecky Decl., Ex. P [Acosta NARS Reference Manual] at P21–P43; Konecky Decl., Ex. V [Acosta NARS Training Manual].)

Acosta's Sets and Projects ("ASAP") division performs specific tasks that are unique to that division. (Gerwitz Decl. ¶ 17.) This division provides teams of three to 25 people who "reset" shelves at the Stores' direction, by moving and placing large volumes of retail products according to changing schematics and plan-o-grams. (Id. ¶ 17(C), (G).) In addition, ASAP merchandisers perform unique "project" services for Manufacturers, to ensure that their individual products are placed, serviced, and sold correctly within a variety of different types of retail outlets. (Id. ¶¶ 2, 17(D).) Project tasks performed may include attaching promotional stickers to products, building and taking photos of promotional displays, filling out survey audits with information about specific product displays, or checking inventory and restocking products. (Id. ¶ 17(D); see also Docket No. 89, Declaration of Alvin Johnson in Support of Plaintiffs' Motion [Johnson Decl.] ¶ 2; Docket No. 88, Declaration of Natasha Lytle in Support of Plaintiffs' Motion [Lytle Decl.] ¶¶ 2, 3; Docket No. 91, Declaration of Charles Sutton in Support of Plaintiffs' Motion [Sutton Decl.] ¶¶ 2, 3.) An individual ASAP merchandiser may perform both "reset" and "project" jobs. (Gerwitz Decl. ¶ 17(D) n.3.) Acosta's ASAP merchandisers use the company's "Natural Insight" web site to accept and

1   complete jobs and to report their hours; merchandisers in other divisions do not use

2   this site.  (Gerwitz Decl. ¶¶ 6, 7, 19(A), (F); Docket No. 92, Konecky Decl., Ex. B [Lytle

3   Depo. (Mem.)] 83:21–84:3; see Docket No. 92, Konecky Decl., Ex. O [Natural Insight

4   Merchandiser Training Manual] at O22–O30.)

5        **2. Pre-Store Duties**

6        Plaintiffs present evidence that merchandisers across Acosta's divisions are

7   required to perform certain tasks before performing work at a retail site, referred to as

8   a store "call."  First, merchandisers receive assignments from Acosta supervisors via

9   their Acosta e-mail and voicemail accounts, or by accepting jobs via the Natural

10   Insight web site.  They are required to check e-mail, voicemail, and the Natural Insight

11   site throughout the day in order to receive information about assignments.  (PMK Dep.

12   55:16–56:25 (confirming that supervisors contact merchandisers via voicemail and e-

13   mail during times when merchandisers are not in-store); Docket No. 145, Declaration

14   of Matthew B. George in Support of Plaintiffs' Motion [George Decl.], Ex. 4 [Puliselich

15   Depo. (Reply)] 226:13–15 (testifying that NARS merchandisers were advised to check

16   e-mail before and after calls); Konecky Decl., Ex. S [Acosta Retail Communications

17   Expectations for Every Associate] (requiring ASAP associates to check voicemail a

18   minimum of three times per day, and e-mail once per day); Konecky Decl., Ex. T

19   [ASAP Merchandiser Welcome Packet] (suggesting that ASAP merchandisers check

20   Natural Insight daily for opportunities); Konecky Decl., Ex. U [Natural Insight Training

21   Manual] at U02–U08 (instructing on how to accept opportunities and schedule calls on

22   the site).)

23        Defendants confirm that ASAP "project" merchandisers accept jobs through

24   Natural Insight, according to their schedules, but provide evidence that ASAP "reset"

25   merchandisers are given their weekly schedules in advance, either via voicemail from

26   their supervisor, or via a print-out handed to them while they are working.  (Docket No.

27   138, Putative Class Member ("PCM") Declarations in Support of Defendants'

28   Opposition, PCM Saavedra Decl. p. 15, ¶ 5; PCM Meyers Decl., p. 18, ¶ 5; PCM

Dobbins Decl., p. 29, ¶¶ 3, 5; PCM J. Gonzalez Decl., p. 8, ¶ 6; PCM Bille Decl. pp. 23–24, ¶ 5; PCM Zellman Decl., p. 51, ¶ 6; PCM Blackwell Decl., p. 55, ¶ 5.)  NARS Device users create their own schedules on the devices once weekly or monthly, and have some flexibility in assigning dates and times to the calls.  (Gerwitz Decl. ¶ 31(A), 36(A); PCM Amador Decl., p. 248, ¶ 5; PCM Luna Decl., p. 239, ¶ 5.)

Second, Plaintiffs present evidence that, after receiving an assignment and prior to traveling to the retail site, merchandisers are required to check their voicemail, e-mail, and the Natural Insight site for last-minute information about products and assignments and supervisor comments and instructions, and in order to print project forms, download surveys, retrieve plan-o-grams and schematics, review product information, and learn what tools or materials to bring to the store.  (Johnson Decl. ¶¶ 3, 4; Lytle Decl. ¶ 3; Docket No. 90, Declaration of Richard Puliselich in Support of Plaintiffs' Motion [Puliselich Decl.] ¶ 6; Sutton Decl. ¶ 4, 5; Lytle Depo. (Mem.) 166:1–173:21, 30:17–34:17, 185:23–186:20; George Decl., Ex. 3 [Johnson Depo. (Reply)] 17:19–18:24; Puliselich Depo. (Reply) 40:20–44:23, 188:15–20, 189:9–190:3, 227:13–20, 258:3–15 (testifying that he and other team members were consistently required to print-out or complete a "tremendous volume" of documentation prior to arriving at a store call); Konecky Decl., Exs. E, F, G, H, I, J, K, L, M [Opt-In Plaintiffs' Responses to Defendants' First Set of Interrogatories] Nos. 1, 9, 13; Natural Insight Merchandiser Training Manual at O22–O27; Acosta NARS Reference Manual at P25–28; Konecky Decl., Ex. T [ASAP Merchandiser Welcome Packet] at T01; Natural Insight Training Manual at U09–U10.)  This information changes frequently, and merchandisers are instructed, by supervisors and by Acosta training manuals, to perform this work shortly before departing for the store, so that they will have the most up-to-date information—and, indeed, so that they will be able to perform their jobs. (Johnson Decl. ¶ 4; Lytle Decl. ¶ 3; Puliselich Decl. ¶ 4; Lytle Depo. (Mem.) 33:30–34:10, 170:15–173:13, 174:7–9; Johnson Depo. (Reply) 17:19–18:24, 88:20–97:7.)  Merchandisers may even be expected to communicate with supervisors

1  via cell phone while commuting to a retail site.  (Johnson Decl. ¶ 10; Lytle Decl. ¶ 9;

2  Gerwitz Decl. ¶ 13.)

3         Defendants present evidence that this preparatory work is either not required,

4  or is insubstantial.  (Gerwitz Decl. ¶ 19(C) (stating that "90%" of reset merchandisers

5  "should never download or print a schematic or plan-o-gram because the vast majority

6  of the stores . . . provide these items on site," and that "there is no need (and certainly

7  no requirement)" for a reset merchandiser "to consult a schematic or plan-o-gram prior

8  to a shift" because these are "merely points of reference while a Reset is being

9  performed in the store"; Docket No. 138, Declaration of John Yslas in Support of

10  Defendants' Opposition [Yslas Decl.], Ex. 2 [Sutton Depo. (Opp.)] 95:21–96:16

11  (testifying that payroll documents and plan-o-grams were mailed to his house or

12  available at the store); PCM C. Gonzalez Decl, p. 251, ¶ 4 ("Acosta does not control .

13  . . what I do before going to my first store . . ."); PCM Miranda Decl., p. 67, ¶ 5, PCM

14  Peck Decl., p. 61, ¶ 5, PCM Kaliebe Decl., p. 75, ¶ 5, PCM J. Gonzalez Decl., p. 8, ¶

15  6, PCM Meyers Decl., p. 18, ¶ 5 (all stating that pre-store documents are mailed to

16  house or available at store).)  In particular, Defendants present evidence that NARS

17  Device users are not required to perform pre-store preparatory work, because all

18  necessary documents are available on the mobile devices.  (Gerwitz Decl. ¶ 19(C),

19  (D).)

20         **3.  Post-Store Duties**

21         Plaintiffs present evidence that, after completing the assigned tasks at the

22  retail sites, merchandisers are required to complete the job by transmitting information

23  back to Acosta about the work performed and any data collected, and to report the

24  time spent on the job.  For some jobs, they may be required merely to confirm that the

25  work was performed, and to indicate the time spent and mileage incurred in traveling

26  to and from the job.  Other jobs require the submission of detailed product and work

27  information, such as where and how products were displayed at the retail sites,

28  whether the items were properly tagged, whether sufficient inventory existed, the

1   names of store supervisors on the project, how resets were performed, whether

2   additional projects were completed, and problems encountered.  (Johnson Decl. ¶¶  2,

3   5; Lytle Decl. ¶ 4; Puliselich Decl. ¶ 5; Sutton Decl. ¶¶ 4, 5; Lytle Depo. (Mem.)

4   146:17–147:24, 188:13–189:11; George Decl., Ex. 2 [Sutton Depo. (Reply)]

5   151:21–152:12; Johnson Depo. (Reply) 117:1–121:14; Puliselich Depo. (Reply)

6   40:20–44:23, 188:15–20, 189:9–190:3, 227:13–20, 258:3–15 (testifying that he and

7   other team members were consistently required to transmit NARS data and to

8   complete a "tremendous volume" of other documentation after completing a store

9   call); Opt-In Plaintiffs' Responses to Defendants' First Set of Interrogatories Nos. 1, 9,

10  13; Natural Insight Merchandiser Training Manual at O28 ("[o]nce the assignment has

11  been completed, survey results, time keeping data, call details, and other information

12  need to be entered into the system"); ASAP Merchandiser Welcome Packet at T01

13  (Natural Insight must be reported daily); Natural Insight Training Manual at U11–U13

14  (providing instructions for entering required post-store information, and stating that

15  "[t]he project is not complete until the data is entered via the Natural Insight website

16  and the fax form is sent back").)  All work and data must be reported promptly upon

17  completion.  (Acosta Retail Communications Expectations for Every Associate

18  (requiring reporting within 12 hours of job completion); Lytle Depo. (Mem.)

19  205:5–207:20, 89:22–90:7; Johnson Decl. ¶ 5; Lytle Decl. ¶¶ 4, 9; Puliselich Decl. ¶

20  5.)

21        Defendants present evidence that the post-store work required of Natural

22  Insight users is insubstantial, and need not be completed immediately after the in-

23  store shift.  (Gerwitz Decl. ¶ 19(A), (B) (ASAP reset merchandisers are required to

24  answer only four simple questions on Natural Insight after completing a job, while

25  ASAP project merchandisers may be required to answer as many as 15); Sutton

26  Depo. (Opp.) 144:6–23 (stating that he was required to answer, on Natural Insight,

27  only the same two or four questions regarding the work performed and the same

28  seven questions regarding hours worked); PCM C. Gonzalez Decl, p. 251, ¶ 4

1    ("Acosta does not control . . . what I do . . after my last store"); PCM McGowan Decl.,

2    p. 300, ¶¶ 5, 6; PCM Baylor Decl., p. 78, ¶ 5; PCM Newfield Decl., p. 80, ¶ 4.)

3          For their part, NARS Device users have no post-store duties, other than

4    submitting time sheets, because the data they collect must be transmitted to Acosta

5    from the NARS Device while in-store, and is transmitted by the press of a button.

6    (Gerwitz Decl. ¶¶ 31(B), 36(D); Yslas Decl., Ex. 3 [Johnson Depo. (Opp.)] 38:2–15,

7    41:20–25; Yslas Decl., Ex. 4 [Puliselich Depo. (Opp.)] 167:12–13, 169:15–16

8    (testifying that transmitting NARS data to Acosta took little time); PCM Tinley Decl, p.

9    273, ¶¶ 5, 6; PCM Fulgham Decl., p. 245, ¶ 6; PCM Maxfield Decl., p. 259, ¶ 6; PCM

10    Penrod Decl., p. 294, ¶ 5; PCM Isom Decl., p. 278, ¶ 3; PCM McGowan Decl., p. 300,

11    ¶¶ 5, 6.)  Moreover, any post-store administrative work performed varies substantially

12    between individual merchandisers.  (Puliselich Depo. 177:1–10 (Opp.) (testifying that,

13    in addition to transmitting NARS data, he was required to process "paperwork"

14    following a store call); Yslas Decl., Ex. 1 [Lytle Depo. (Opp.)] 188:13–189:23

15    (testifying that, after completing a call, she was required to enter information into

16    Natural Insight and fax information to Acosta); Johnson Depo. (Opp.) 55:18–21,

17    42:20–43:3 (stating that he was required to send "daily recaps" to his supervisor, but

18    that this requirement "varied by team" and "depended on the manager").)

19          **4.  Time Spent on Out-of-Store Duties**

20          Plaintiffs present evidence that merchandisers spend between 15 minutes and

21    one hour completing the required pre-store and post-store tasks.  (Johnson Decl. ¶¶

22    5, 6; Lytle Decl. ¶ 6; Puliselich Decl. ¶¶ 4, 5; Sutton Decl. ¶ 5; Lytle Depo. (Mem.)

23    185:23–186:20; Yslas Decl., Ex. 1 [Lytle Depo. (Reply)] 176:14–180:17; Johnson

24    Depo. (Reply) 96:4–7, 117:1–121:14; Puliselich Depo. (Reply) 225:2–14; Sutton

25    Depo. (Reply) 151:21–152:12; Opt-In Plaintiffs' Responses to Defendants' First Set of

26    Interrogatories No. 1.)  Acosta's evidence is that the time spent "can range from one

27    minute to three minutes, [in] very extreme cases a little bit longer."  (PMK Depo.

28    179:21–180:25, 73:4–15; see also, e.g., PCM Baylor Decl., p. 78, ¶ 5 (Natural Insight

1    tasks take less than five minutes).)  However, Acosta has never collected data on how

2    much time is spent.  (PMK Depo. 179:21–180:25, 73:4–15.)

3    **C. COMPENSATION AND OVERTIME**

4          Acosta's merchandisers are classified as non-exempt employees and are paid

5    between $9 and $19 per hour.  (Id. at 15:1–6; 31:18–24; 45:17–20; 46:2–9.)  Acosta's

6    policy is that merchandisers are paid for their "call" or "in-store" hours and for their

7    compensable travel time.[1]  (Acosta NARS Reference Manual at P27 (equating "paid

8    time" with "time in-store"); Natural Insight Merchandiser Training Manual at O29

9    (screenshot for reporting hours does not include field for reporting time spent on pre-

10   store or post-store tasks); Konecky Decl., Ex. W [Acosta Time, Leave, and

11   Attendance System ("ATLAS") User Guide] at W02 ("[c]all hours and drive time hours

12   are combined and loaded from Natural Insight as daily total hours"); Konecky Decl,

13   Ex. X [ATLAS Frequently Asked Questions ("FAQ")] at X02 ("[t]he total hours reported

14   on the Timesheet Summary in ATLAS will include both in-store work time and drive

15   time.").)  For each merchandising job, the Natural Insight and NARS systems indicate

16   an estimated or planned amount of "in-store" or "call" time.  (Natural Insight

17   Merchandiser Training Manual at O16 (showing that job acceptance page contains

18   indication of "expected time to complete").)  These time estimates are developed by

19   Acosta's managers in conjunction with Acosta's customers and clients.  (PMK Depo.

20   141:19–142:5.)  After a merchandiser accepts a job, the scheduled time transmits

21   directly from Natural Insight or NARS to Acosta's automated "Time, Leave, and

22   Attendance System" ("ATLAS").  (PMK Depo. 121:20–21, 128:4–8; 9/23/11 Acosta

23   Interrogatory Response at 9.)  The merchandiser may adjust the in-store time

24   recorded in ATLAS, once the job has been completed, in order to reflect the time

25

26

27   _____

28   [1]Merchandisers provide their own transportation to and from the retail sites and are additionally
     compensated for mileage.  (PMK Depo. 197:8–15; Johnson Decl. ¶ 10; Lytle Decl. ¶ 9; Sutton
     Decl. ¶ 8; Opt-In Plaintiffs' Responses to Defendants' First Set of Interrogatories No. 17.)

1   actually worked.  These records are reviewed and approved by management prior to

2   payment.  (PMK Depo. 121:20–122:25.)

3        Compensable travel time is recorded separately, and is defined as any travel

4   time greater than one hour to and from each site.  (Konecky Decl., Ex. Z [Acosta

5   Commute Time Policy HR-303]; see Natural Insight Merchandiser Training Manual at

6   O29 (screenshot showing field for "[a]uthorized payable drive time"); Konecky Decl.,

7   Ex. Y [Acosta Time Sheets] (containing field to enter "[d]rive [t]ime").)  Acosta's

8   commute time policy applies uniformly to all merchandisers.  (PMK Depo.

9   145:16–146:17.)

10        The Parties dispute whether ASAP merchandisers are paid for pre- and post-

11   store tasks.  Specifically, Plaintiffs present evidence that Acosta pays employees

12   based on the job estimates, rather than on the actual hours worked; that out-of-store

13   duties are not accounted for by shift time estimates; that merchandisers are not

14   informed that pre- and post-store tasks are compensable, nor are they instructed to

15   account for time spent on them in their ATLAS time records; and that, indeed,

16   merchandisers do not report and are not paid for time spent on these tasks. (Acosta

17   NARS Training Manual at V09 (stating that "handheld associates will be paid based

18   on workable hours planned"); Konecky Decl., Ex. I [Opt-In Plaintiff Jim Moffat

19   Interrogatory Response] at 2 (stating that he was paid based on his "in-store

20   schedule"); Lytle Depo. (Mem.) 86:1–14 (same); Sutton Decl. (Reply) 278:15–279:5

21   (testifying that he was told to report on his time sheet only his scheduled hours); PMK

22   Depo. 144:20–145:7, 77:23–78:11, 87:9–22, 228:18–229:5 (testifying that managers

23   do not include pre-store and post-store activities in project time estimates); PMK

24   Depo. 83:11–85:7, 86:5–14, 87:9–22, 106:2–9 (testifying that no system has been

25   implemented to ensure that project time estimates include time for out-of-store

26   activities); Puliselich Depo. (Reply) 199:9–16 (scheduled time did not include time to

27   process paperwork before and after calls); PMK Depo. 151:18–20 ("[a]ny work that

28   they are doing in the store—when they arrive at the store, that's when their time

starts"); PMK Depo. 157:7–25; Lytle Depo. (Reply) 92:5–97:9 (testifying that supervisors inform merchandisers that they are compensated only for in-store time, and not for time spent on Natural Insight); Sutton Depo. (Reply) 247:17–249:2 (testifying that he was never told that he could report hours worked outside of a store); Johnson Depo. (Reply) 159:19–160:4 (testifying that he was not paid for out-of-store activities); Puliselich Depo. (Reply) 246:2–4 (testifying that his time sheet reflected only in-store time); Johnson Decl. ¶¶ 7–9; Lytle Decl. ¶ 8; Puliselich Decl. ¶¶ 7, 8; Sutton Decl. ¶ 7; Opt-In Plaintiff Moffat Interrogatory Response at 1–2; see also Natural Insight Merchandiser Training Manual at O29 (screenshot for reporting hours; does not include field for reporting time spent on pre-store or post-store tasks); Acosta Time Sheets (containing only fields to enter "start time," "end time," overtime hours, "total hours," "[i]n [s]tore hours," "[d]rive [t]ime," and "[r]eimbursable [m]iles (over 40)").) Instead, merchandisers who complain about Acosta's procedures are threatened with replacement. (Johnson Depo. (Reply) 96:8–97:4, 204:10–205:15; Puliselich Depo. (Reply) 229:3–232:21; Lytle Depo. (Reply) 69:25–71:3.)

Defendants cite contrary evidence that merchandisers are paid based on actual time worked, rather than estimated project times, and that time spent on out-of-store tasks is compensated for by paying merchandisers for a greater number of in-store hours than were actually worked, or by billing for "work from home" or "office" time. (Gerwitz Decl. ¶¶ 12, 13, 19(G) (confirming that Acosta uses estimated times to plan store calls, but denying that merchandisers are paid based on the estimated time; instead, employees "are instructed to enter time for all hours worked," and "are paid for their self-reported time worked and not . . . any sort of estimate"; Johnson Depo. (Opp.) 159:7–18, 161:2–25, 166:24–167:3, 170:22–171:4 (time entered on time sheets was based on actual, not estimated, time for call); PMK Depo. 93:9–25, 154:17–22, 174:4–9 (stating that time spent on work activities performed outside the store is compensated for by merchandisers leaving the store early); Gerwitz Decl. ¶¶ 11, 13, 14 (describing various ways that administrative time is included in the in-store

hours reported by merchandisers, and stating that "merchandising projects oftentimes take less time than the estimated time," so that "Acosta employees are in fact often paid for more time than actually worked"); Lytle Depo. (Opp.) 108:14–112:1, 181:19–184:2 (testifying that she was told to leave a shift early, but would be paid for the full shift, a "handful" of times, and admitting to having faxed in a time sheet during a shift); Johnson Depo. (Opp.) 169:16–170:4, 179:4–20 (admitting to having been overpaid from February to June or August 2008); PCM Lupo Decl., p. 178, ¶ 10; PCM Walsh Decl., p. 201 ¶ 8; PCM Alfonseca Decl., p. 201, ¶ 8; PCM Brohokyz Decl., p. 174, ¶ 10; PCM Canady Decl., p. 136, ¶ 7; PCM Jordan Decl., p. 163, ¶ 7; PCM Zellman Decl., p. 52, ¶ 8; PCM Beal Decl., p. 3, ¶ 11; PCM A. Gonzalez Decl., p. 39, ¶ 7; PCM Blackwell Decl., p 56, ¶ 9; PCM Castillo Decl., p. 287, ¶¶ 9–10; PCM Gomez Decl., p. 291, ¶ 10; PCM Evans Decl., p. 46, ¶ 6; PCM Carter Decl., p. 209, ¶ 11; PCM Abud Decl., p. 229, ¶ 12; PCM Condon Decl., p. 129, ¶ 12; PCM Stark Decl., p. 157, ¶ 9.)

Only Acosta's overtime policy suggests that time spent working outside the retail sites, other than travel time, can be compensable.  (Ex. AA [Acosta Overtime Policy HR-301] (stating that "[a]ll hours worked whether in the office, at home or at an assigned work location, must be recorded and preapproved by the immediate supervisor.").)  This overtime policy applies to all merchandisers.  (Acosta Overtime Policy HR-301; PMK Depo. 91:8–15, 157:7–25.)  However, the Parties have produced conflicting evidence as to whether overtime is accurately recorded and paid, for either in-store time or for pre- or post-store tasks.  (Compare Konecky Decl., Ex. BB (supervisor e-mail indicating that no overtime will be approved for series of short projects); Konecky Decl., Ex. CC (supervisor e-mail indicating that merchandiser's paycheck was short because she failed to receive pre-approval for overtime hours); Konecky Decl., Ex. DD (supervisor e-mails instructing merchandisers to enter overtime hours as work performed on a different day); Lytle Depo. (Mem.) 175:23–176:12 (testifying to the same practice); Johnson Decl. (Opp.) 165:24–166:13

1   (testifying that supervisor denied him overtime on multiple occasions); Opt-In Plaintiff

2   Moffat Interrogatory Response at 23 (stating that "Plaintiff was repeatedly told that the

3   company did not give overtime"), <u>with</u> Gerwitz Decl. ¶ 9 (stating that Acosta's policy is

4   to "pay compensation to all nonexempt employees for all hours worked over 40 in a

5   calendar week—which includes administrative time," and that she is "not aware of a

6   single instance of any Acosta employee being discouraged from reporting all time

7   worked, be it in-store work, non-commute travel time, administrative work, or any

8   other work of any kind"); Johnson Depo. (Opp.) 163:4–164:4, 164:20–165:5 (admitting

9   to having been paid overtime in June and August 2009).)

10                                              **III.**

11                                         **DISCUSSION**

12   **A.  LEGAL STANDARD: FLSA COLLECTIVE ACTION CERTIFICATION**

13          The FLSA was enacted in 1938 to protect covered workers from improper

14   working conditions such as excessive hour requirements.  <u>Friedrich v. U.S. Computer</u>

15   <u>Servs.</u>, 974 F.2d 409, 412 (3d Cir. 1992) (citing <u>Barrentine v. Arkansas-Best Freight</u>

16   <u>Sys., Inc.</u>, 450 U.S. 728, 739 (1981), <u>cert. denied</u>, 471 U.S. 1054 (1985)).  This Act

17   requires employers to compensate covered employees at a minimum of one-and-one-

18   half times their standard hourly wage for working time in excess of forty hours per

19   week.  29 U.S.C. § 207(a)(1); <u>see also</u> 29 U.S.C. § 213(b).

20          The FLSA explicitly allows employees to proceed collectively in order to

21   enforce provisions of the Act.  29 U.S.C. § 216(b).  Thus, an action "may be

22   maintained against any employer . . . in any Federal or State court of competent

23   jurisdiction by any one or more employees for and in behalf of himself or themselves

24   and other employees similarly situated."  29 U.S.C. § 216(b).  At the same time, "[n]o

25   employee shall be a party plaintiff to any such action unless he gives his consent in

26   writing to become such a party and such consent is filed in the court in which such

27   action is brought."  <u>Id.</u>  Thus, this form of action is an opt-in form for similarly situated

28   employees.  "To obtain court authorization to send the proposed notice, plaintiffs must

1  submit evidence establishing at least a colorable basis for their claim that a class of

2  'similarly situated' plaintiffs exist[s]."  Severtson v. Phillips Beverage Co., 137 F.R.D.

3  264, 267 (D. Minn. 1991).

4           Section 216(b) does not define "similarly situated," and the Ninth Circuit has

5  yet to define it, see Leuthold v. Destination Am., Inc., 224 F.R.D. 462, 466 (N.D. Cal.

6  2004), but most courts and district courts within this Circuit follow a two-tiered

7  approach to certification of FLSA collective actions.  Edwards v. City of Long Beach,

8  467 F. Supp. 2d 986, 989–90 (C.D. Cal. 2006).  Under this approach,

9              [T]he first step is for the court to decide, 'based primarily on the

10             pleadings and any affidavits submitted by the parties, whether the

11             potential class should be given notice of the action.'  Given the

12             limited amount of evidence generally available to the court at this

13             stage in the proceedings, this determination is usually made 'under

14             a fairly lenient standard and typically results in conditional class

15             certification.'  It is the plaintiffs' burden to show that 'the proposed

16             lead plaintiffs and the proposed collective action group are similarly

17             situated for purposes of § 216(b).'  'Plaintiff need not show that his

18             position is or was identical to the putative class members' positions;

19             a class may be certified under the FLSA if the named plaintiff can

20             show that his position was or is similar to those of the absent class

21             members.  However, unsupported assertions of widespread

22             violations are not sufficient to meet Plaintiff's burden.'

23  Id. at 990 (citations omitted); accord, e.g., Deane v. Fastenal Co., No. C 11–00042 SI,

24  2011 WL 5520972, at *2 (N.D. Cal. Nov. 14, 2011); Misra v. Decision One Mortg. Co.,

25  LLC, 673 F. Supp. 2d 987, 992–93 (C.D. Cal. 2008); Pfohl v. Farmers Ins. Group, No.

26  CV 03-3080 DT (RCx), 2004 WL 554834, at *2 (C.D. Cal. Mar. 1, 2004); see also

27  Thiessen v. Gen. Elec. Capital Corp., 267 F. 3d 1095, 1102 (10th Cir. 2001); Hipp v.

28  Liberty Nat. Life Ins. Co., 252 F.3d 1208, 1219 (11th Cir. 2001).  Courts making a

1   determination as to whether to certify a collective action and permit notice to be

2   distributed to putative class members "tend to require 'nothing more than substantial

3   allegations that the putative class members were together the victims of a single

4   decision, policy, or plan.'" Sarviss v. Gen. Dynamics Information Tech., Inc., 663 F.

5   Supp. 2d 883, 903 (C.D. Cal. 2009) (citation omitted).  However, these allegations

6   must be "supported by affidavits which successfully engage a defendant's affidavits to

7   the contrary." Trinh v. JP Morgan Chase & Co., No. 07–CV–1666 W(WMC), 2008 WL

8   1860161, at *3 (S.D. Cal. Apr. 22, 2008).  The factual showing required of putative

9   collective action plaintiffs at this stage has frequently been described as "modest."

10  See, e.g., Misra, 673 F. Supp. 2d at 995.[2]

After discovery is complete and the case is ready for trial, the party opposing

12  collective action treatment may move to decertify the class.  Edwards, 467 F. Supp.

13  2d at 990 n.1.  At that stage, the court makes a factual determination as to whether

14  the plaintiffs are similarly situated, based on the following factors: "(1) the disparate

15  factual and employment settings of the individual plaintiffs; (2) the various defenses

16  available to the defendants with respect to the individual plaintiffs; and (3) fairness

17  and procedural considerations." Id. (internal quotations and citation omitted).  If the

18  court determines that the plaintiffs are not similarly situated, it may decertify the

19  collection action and dismiss the opt-in plaintiffs without prejudice.  Id.

In cases in which "discovery has been undertaken relating to the issues of

21  certification of th[e] action as a collective action," the Court "can proceed to the

22  second determination . . . and weigh relevant factors to determine whether the

23  plaintiffs are similarly situated." Pfohl, 2004 WL 554834, at *3.  However, the Court

24

25  [2]Acosta argues that, in light of the Supreme Court's decision in Wal-Mart v. Dukes, 131 S. Ct.
    2541 (2011), denying the plaintiffs' motion for class certification under Federal Rule of Civil
26  Procedure 23 for failure to satisfy the commonality requirement, "this Court should apply a
    heightened standard of proof in analyzing whether Plaintiffs have proved similarity." (Docket No.
    138, Opp. at 7–8.)    Acosta cites three district court cases that it contends denied FLSA
27  certification under the Wal-Mart standard.  The Court is not persuaded that Wal-Mart alters the
    first-tier inquiry for FLSA certification decisions.  Neither Wal-Mart itself nor the three district
28  court cases cited by Defendants held as much.

1    does not have to proceed to the second determination, and this determination has

2    been characterized as something that more appropriately takes place upon a motion

3    to decertify a provisional class.  Leuthold, 224 F.R.D. at 467-68.  In either event, the

4    determination of whether Plaintiff and the class are similarly situated differs from and

5    is less stringent than the class action certification standard because "the FLSA simply

6    requires that the employees be 'similarly situated.'  The other factors required in class

7    actions – numerosity, typicality, etc. – do not apply to collective actions."  Scholtisek v.

8    Eldre Corp., 229 F.R.D. 381, 386 (W.D.N.Y. 2005) (citations omitted).

9    **B. ANALYSIS**

10            **1. Collateral Estoppel**

11            As an initial matter, Defendants argue that Plaintiffs are collaterally estopped

12   from bringing this action collectively by the decertification of "substantially the same

13   collective" action in Price v. Acosta, Inc., Case No. 03-2686 (W.D. Tenn. 2008), and

14   by the court-approved stipulation to dismissal with prejudice of Human v. Acosta,

15   Case No. Cv-10-237 ODW (RCx) (C.D. Cal. 2010), a putative class action under

16   California Code of Civil Procedure section 382, in which the plaintiff failed to timely

17   bring a motion for class certification.  (Opp. at 5–6; see Defendants' Request for

18   Judicial Notice [RJN], Ex. 2 [Price v. Acosta Decertification Decision], Ex. 4 [Human v.

19   Acosta Dismissal with Prejudice].)[3]  "Issue preclusion bars relitigation of issues

20   adjudicated in an earlier proceeding if three requirements are met: (1) the issue

21   necessarily decided at the previous proceeding is identical to the one which is sought

22   to be relitigated; (2) the first proceeding ended with a final judgment on the merits; and

23   (3) the party against whom collateral estoppel is asserted was a party or in privity with

24   a party at the first proceeding."  Reyn's Pasta Bella, LLC v. Visa USA, Inc., 442 F.3d

25

26   _____

27   [3]The Court takes judicial notice of these court decisions because they are matters of public
     record.  See Lee v. City of Los Angeles, 250 F.3d 668, 689 (9th Cir. 2001) (stating that "under
28   Fed. R. Evid. 201, a court may take judicial notice of 'matters of public record.'") (quotation
     omitted); see also Brown v. Bank of America, N.A., No. CIV S–10–1758, 2011 WL 1253844, at
     *3 (E.D. Cal. Mar. 31, 2011).

741, 746 (9th Cir. 2006) (citing Kourtis v. Cameron, 419 F.3d 989, 994 (9th Cir. 2005)). "'In certain limited circumstances,' a nonparty may be bound by a judgment because she was 'adequately represented by someone with the same interests who [wa]s a party' to the suit." Taylor v. Sturgell, 553 U.S. 880, 892 (2008) (citation omitted).

The Supreme Court has held that "[r]epresentative suits with preclusive effect on nonparties include properly conducted class actions." Id. However, a "properly conducted class action" is one in which a class has been certified under Federal Rule of Civil Procedure 23. Thus, "[n]either a proposed, nor a rejected, class action may bind nonparties." Smith v. Bayer Corp., 131 S. Ct. 2368, 2380 (2011). Moreover, Defendants cite to no authority for the proposition that a rule contrary to that articulated in Smith applies to collective actions under the FLSA, or to proposed class actions under California Code of Civil Procedure section 382. (See Opp. at 5–6.) Recognition of our legal system's "deep-rooted historic tradition that everyone should have his day in court" and the narrow approach traditionally taken by courts to issue preclusion counsels against lending preclusive effect in either circumstance. Richards v. Jefferson County, 517 U.S. 793, 798 (1996); see also Smith, 131 S. Ct. at 2381 (". . . [O]ur legal system generally relies on principles of stare decisis and comity among courts to mitigate the sometimes substantial costs of similar litigation brought by different plaintiffs. We have not thought that the right approach (except in the discrete categories of cases we have recognized) lies in binding nonparties to a judgment.") This Court holds, therefore, that Plaintiffs' attempt to seek conditional collective certification in this action is not precluded by Price v. Acosta or by Human v. Acosta.

### 2. Conditional Certification

Through the collective action, Plaintiffs seek to represent a class of merchandisers—"nonexempt employees in Acosta's retail department"—working for Defendants throughout the United States, who are "subject to Acosta's written

overtime policy HR-301 and/or Acosta's written commute time policy HR-303."   (Mot. at 1; see also Mem. at 1, 16; Compl. ¶¶ 21, 22).

The Court finds that Plaintiffs have satisfied their burden, at this early stage, to make "substantial allegations" or a "modest factual showing" that they and other merchandisers employed by Acosta nationwide were subject to "a common policy or plan that violated the law." Sarviss, 663 F. Supp. 2d at 903; Misra, 673 F. Supp. 2d 987, 995. Plaintiffs rely on: (1) declarations and deposition testimony by four former Acosta merchandisers in the southern California region, including two ASAP merchandisers who utilized the Natural Insight web site in their work and two merchandisers in other Acosta divisions who worked with NARS Devices; (2) verified interrogatory responses submitted by an additional ten Acosta merchandisers; (3) deposition testimony by Acosta's PMK, HR Business Partner, West, Toni Gerwitz; and various Acosta policy, training, and reference materials applicable to Acosta merchandisers in all geographic locations. For their part, Defendants rely on a declaration filed by Gerwitz; deposition testimony by Gerwitz and by former Acosta merchandisers; and declarations filed by 105 current and former merchandisers, all employing substantially the same language. Although the Parties' evidence conflicts in numerous and significant ways, the Court is satisfied that the "fairly lenient standard" required to support conditional certification is met here. Edwards, 467 F. Supp. 2d at 990.

Specifically, Plaintiffs have presented evidence that Acosta merchandisers in different divisions, performing different in-store tasks, and utilizing both the Natural Insight web site and Acosta's handheld NARS devices were required to perform similar duties from outside the store and outside the hours of their scheduled shifts, including checking e-mail and voicemail; responding to inquiries from Acosta management; and preparing for, and completing, their "call" duties, by answering questions and submitting documentation. Plaintiffs have also presented evidence that they were not compensated for performing these tasks in any way, including by

payment of "in-store" hours that accounted for time spent on out-of-store tasks, "drive time" hours, or overtime. Plaintiffs have presented further evidence that Acosta's written policies, applicable nationwide, and its practices and procedures discourage merchandisers from seeking payment for all compensable time worked. (See Mem. at 16–23; Docket No. 144, Reply at 15–18.) Although Defendant submits evidence that some of its merchandisers were purportedly not subjected to the violations alleged in the operative complaint, that alone does not preclude conditional certification of this collective action. See Creely v. HCR ManorCare, Inc., 789 F. Supp. 2d 819, 840 (N.D. Ohio 2011) ("happy camper" affidavits of little use at conditional certification stage of the proceedings). What is more notable is that Defendants make almost no reference to Acosta's pertinent policy and training documents. In short, conditional certification does not require a showing that putative class members are identically situated, just that they are similarly situated, and a detailed analysis of such issues as differing job functions is more properly made on a motion for decertification. See Edwards, 467 F. Supp. 2d at 990.

Thus, weighing the Parties' evidence, the Court finds the evidence more substantial that (1) merchandisers are required to receive their schedules and information about their upcoming calls by checking e-mail and voicemail accounts, by logging in to the Natural Insight web site and NARS program, and by speaking with supervisors outside of the merchandisers' in-store hours; (2) merchandisers must complete call duties outside of in-store hours; and (3) merchandisers are not compensated for time spent completing out-of-store tasks. At the conditional certification stage, this factual showing is sufficient to support a finding of similarity.

Accordingly, the Court **GRANTS** Plaintiffs' Motion for conditional collective certification of a nationwide class of non-exempt employees in Acosta's retail department who are subject to Acosta's written overtime and commute time policies.

### 3.  Second Stage Analysis

Defendants request this Court to undertake the second stage analysis on the basis that "substantial discovery" has already been conducted in this action.  (Opp. at 6, 8–9.)  Although discovery on class-related issues has been conducted in this litigation since April 15, 2011, the Court does not feel compelled to proceed to the second-tier analysis for reasons similar to those articulated by the court in <u>Leuthold</u>.  That court explained:

> [T]he two-tier approach contemplates progression through the notice
> stage before reaching the more rigorous inquiry required to maintain the
> class. . . .  At the first tier, the proposed class representatives ask the
> court to determine whether conditional certification is proper so that
> notice may be sent to potential plaintiffs.  At the second tier, the impetus
> for reaching the more stringent factual analysis is a motion to decertify
> the class filed by defendants.  It would be unusual to reach the latter
> inquiry upon motion of the plaintiffs.  Even more anomalous would be to
> reach the questions governing the standard for decertification without
> ever reaching the threshold question whether conditional certification
> and notice are appropriate.

<u>Leuthold</u>, 224 F.R.D. at 467-68.

Numerous courts in this Circuit have held that the more rigorous second-tier analysis does not apply until after the close of discovery, at the point when the case is ready for trial, and others have held that the notice stage is effective as long as discovery on collective certification continues.  <u>See, e.g.</u>, <u>Labrie v. UPS Supply Chain Solutions, Inc.</u>, No. C08-3182, 2009 WL 723599, at *3 (N.D. Cal. March 18, 2009) (first stage analysis applies until discovery is complete and case is ready for trial); <u>Edwards</u>, 467 F. Supp. 2d at 990 n.1 (same); <u>Goudie v. Cable Communications, Inc.</u>, No. 08-CV-507-AC, 2008 WL 4628394, at *5 (D. Or. Oct. 14, 2008) (first stage analysis applied as long as class-related discovery continues).  Although Defendants

1    cite to one intra-circuit and two out-of-circuit cases for the proposition that a court may
2    require a heightened factual showing to be made where <u>some</u> discovery has been
3    <u>conducted</u> on the certification issue, courts within this Circuit overwhelmingly "refuse
4    to depart from the notice stage analysis prior to the close of discovery." <u>Kress v.</u>
5    <u>PricewaterhouseCoopers, LLP</u>, 263 F.R.D. 623, 629 (E.D. Cal. 2009).  Indeed, this
6    Court has refused to proceed to the second stage analysis, as a matter of course,
7    even in circumstances in which discovery had closed and some forms of notice had
8    been sent to potential group members.  <u>See</u> <u>Dudash v. Varnell Strucks and Assocs.</u>,
9    No. 04-10067 GAF (RZx), at 36 (C.D. Cal. Mar. 6, 2006).

10         Proceeding to the second stage analysis at the present stage in this action
11   would be premature.  Discovery related to certification is incomplete; notably, the
12   Parties have not resolved differences regarding the sufficiency of Acosta's responses
13   to Plaintiffs' written discovery requests; Plaintiffs have not had an opportunity to
14   depose Acosta's PCM declarants regarding their statements; and this Court earlier
15   denied without prejudice Plaintiffs' request that Acosta identify merchandiser
16   witnesses and potential opt-in plaintiffs, as premature.  (<u>See</u> Reply at 4, 15; Docket
17   No. 78.)  Should Defendants choose to file a decertification motion at a later stage
18   during this litigation, the Court will be able to proceed on a more complete record.
19   Accordingly, the Court declines to proceed to the second stage analysis.

20         **4.  The Parties' Requests to Facilitate/Limit Notice**

21         Defendants request that the Court narrow the scope of notice to the named
22   Plaintiffs' unit groups or to California; to a statutory period of two years, rather than
23   three; and to an opt-in period of 30 days, rather than the 90 days proposed by
24   Plaintiffs.  (Opp. at 25.)  The Court declines to impose geographical or intra-
25   organizational limitations on notice at this stage; sub-groups may be organized or
26   eliminated at later stages.  In addition, on the basis of the evidence adduced, the
27   Court declines to limit notice to the two-year statutory period for unwillful violations.
28   Pursuant to 29 U.S.C. § 255(a), the Court permits a notice period of three years from

1   the date the cause of action accrued.  As to the period for opt-in, the Court declines to

2   resolve the Parties' difference now, and reserves its ruling until after the Parties have

3   filed proposed notices.  Accordingly, the Court **DENIES** Defendants' request to limit

4   the scope of notice.

5          Plaintiffs request that the Court toll the statute of limitations for all opt-in

6   Plaintiffs as of the date of this Order, because of delays caused by Acosta's motion to

7   stay and the consolidation of this case with two other cases, and because Plaintiffs

8   timely requested, but Acosta has not yet produced, class member contact information.

9   Equitable tolling is justified on the last basis, exclusive of the other bases, because

10  Plaintiffs have diligently pursued their legal rights and are without fault for the delay.

11  See Adams v. Inter-Con Sec. Sys., Inc., 242 F.R.D. 530, 543 (N.D. Cal. 2007) (tolling

12  where defendants withheld contact information for potential class members before

13  conditional certification).  Accordingly, the Court **GRANTS** Plaintiffs' request to toll the

14  statute of limitations for opt-in Plaintiffs to the date of this Order.

15         Finally, Plaintiffs request that the Court facilitate notice by (1) directing

16  Defendants to produce a "computer-readable data file containing the names, last

17  known addresses, telephone numbers, job titles and last known email addresses" of

18  all "persons within the proposed class who have been employed by Defendants in the

19  United States at any time within three years" of the Court's present Order; and (2)

20  "appoint a third-party administrator to mail the notice to all class members within

21  seven days of receipt of the data files and post the notice on the websites of Plaintiffs'

22  counsel."  (Docket No. 86, Not. at 1.)  Because the Court grants Plaintiffs' Motion for

23  conditional collective certification, the Court also **GRANTS** the first of these additional

24  requests.  The Court defers ruling on the second request until proposed notices are

25  received from the Parties.

26  //

27  //

28  //

IV.

**CONCLUSION**

For the reasons set forth herein, Plaintiffs' motion for conditional collective certification under the FLSA is **GRANTED**.  Defendants are hereby **ORDERED** to produce to Plaintiffs a computer-readable data file containing the names, last known addresses, telephone numbers, job titles and last known e-mail addresses of all persons within the proposed class who have been employed by Defendants in the United States at any time within three years of the date of the Court's present Order. Plaintiff is to submit the proposed notices, following consultation with Defendant, to the Court on or before **Monday, January 9, 2012**.  If the parties are unable to reach agreement as to the contents of the proposed notices, Defendant may file opposition to the proposed notices on or before **Monday, January 16, 2012**, and Plaintiff may reply on or before **Monday, January 23, 2012**.  The applicable opt-in deadline – if not agreed upon by the parties – will then be set.

The hearing scheduled for Monday, December 19, 2011, is **VACATED.**


IT IS SO ORDERED.


DATED: December 16, 2011

_____
Judge Gary Allen Feess
United States District Court